**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

K.N. and J.N., on behalf of
J.N.,

          Plaintiffs,        Civil No. 17-7976 (NLH/JS)

    v.                **OPINION**

GLOUCESTER CITY BOARD OF
EDUCATION,

          Defendant.

**APPEARANCES:**

CATHERINE MERINO REISMAN
REISMAN CAROLLA GRAN & ZUBA LLP
19 CHESTNUT STREET
HADDONFIELD, NJ 08033-1810

    *Attorney for Plaintiffs K.N. and J.N, on behalf of J.N.*

BRETT E.J. GORMAN
PARKER MCCAY PA
9000 MIDLANTIC DRIVE
SUITE 300
MT. LAUREL, NJ 08054

    *Attorney for Defendant Gloucester City Board of Education.*

**HILLMAN, District Judge**

    This case concerns the appeal of a decision of an administrative law judge ("ALJ") finding no violations of federal and state anti-discrimination laws in a school district's provision of services for an autistic child, J.N, in an after-school program ("ASP").  Presently before the Court is Plaintiffs' Motion for Judgment on the Administrative Record

("Motion for Judgment").  The Court will grant Plaintiffs'
Motion for Judgment, in part, and will order supplemental
briefing on the issue of remedies.

<u>**BACKGROUND**</u>

This Court takes its facts from the parties' statements of
material facts.  This Court will note disputes where relevant.

J.N. was a resident within the area served by Defendant
Gloucester City Board of Education (the "District").  During the
2013-2014 and 2014-2015 school years, J.N. attended an
elementary autism program at Mary Ethel Costello School ("Mary
Ethel").  Jennifer Williams, a school social worker, was J.N.'s
case manager and at one point, a one-to-one aide in the ASP.
She was a daily presence in J.N.'s classroom during the 2013-
2014 school year.  Kristen Brennan, a special education teacher,
taught J.N. since 2013.  Anita Dalton-Haggerty ("Haggerty") was
J.N.'s one-to-one aide from 2008 until at least 2016.  Nicholas
Orsino is a classroom aide and was in J.N.'s classroom for at
least three years.

The District ran an ASP during the 2013-2014 and 2014-2015
school year through a grant from the 21st Century Community
Learning Center Program (the "21st Century Grant").  During the
2013-2014 school year (when J.N. was in third grade), J.N. was
bussed from Mary Ethel to Cold Springs Elementary School ("Cold
Springs") for the ASP.  During the 2014-2015 school year (when

J.N. was in fourth grade), J.N. attended the ASP at Mary Ethel and was not bussed.[1]

The ASP usually ran from approximately 3:00 or 3:15 PM to 6 PM. According to Plaintiffs, the ASP was "designed to address the education[al], recreational, social, cultural, emotional, and physical needs of [] students" and included academic support, "sports, yoga, kickboxing, theater activities, cooking, science activities, jewelry making, arts & crafts, and team-building activities." (Pls.' SOMF ¶ 6.) The classrooms were inclusive, containing both general and special education students. Approximately 100-150 total students were a part of the ASP during the relevant times.

A general day at the ASP would include the following:

> These students would come in, they would have [a] snack and a little bit of free time. The students would then work on their homework, having 20 minutes of free reading, silent reading, and then typically

---

[1] The court notes that Defendant disputes these portions of Plaintiffs' statement of material facts asserting it relies "on its counter statement of material facts." (Def.'s SOMF ¶¶ 3-5.) Reviewing the counterstatement of facts, the Court finds there is no dispute. Although the Court declines to do so here, the Court may deem Plaintiffs' entire statement of material facts admitted because of Defendant's improper response. See Juster Acquisition Co., LLC v. N. Hudson Sewerage Auth., No. 12-3427 (JLL), 2014 U.S. Dist. LEXIS 8703, at *5 n.1 (D.N.J. Jan. 23, 2014) ("[A]ny statement, or portion thereof, that is not clearly denied — in substance, not merely with the label 'disputed' — and with a proper citation to the record in a responsive Rule 56.1 statement is deemed admitted."). The Court will note when there is an actual dispute. If it does not note so, the Court has determined that a fact summarily denied by Defendant is not actually disputed.

> they would either have group activities within the
> classroom setting or on Fridays they may go to the gym
> or watch a movie.

(Tr. 9/11/2015 at 68:13-19.)

Because it seems to be of most relevance to this case, the Court will break down J.N.'s attendance at the ASP in fall 2013, spring 2014, and fall 2014 and what behavioral issues occurred at the ASP and during the school day at those times. The program ended after spring 2015 because the District did not receive the 21st Century Grant that provided funding for the ASP. J.N. attended a different ASP and an extended school year program (the "ESY Program") from July to December 2015 (with one-to-one support and access to a group aide) and from January 2016 to present (with two-to-one support) at parental expense. J.N. also attended the ASP in spring 2013 with a trained, one-to-one aide.

### Fall 2013

As discussed supra, during fall 2013, J.N. attended the ASP and was bussed from Mary Ethel to Cold Springs. Before starting the ASP, K.N. spoke with Williams and "expressed concerns" about ensuring J.N.'s ASP aide was appropriately trained. (Pls.' SOMF ¶ 10.) J.N. was provided with a one-to-one aide for the ASP, Jane Heitman. During this time in the ASP, J.N. "exhibited behavioral problems, aggression, self-injurious behavior and

4

tantrums."[2]  (Pls.' SOMF ¶ 11.)  Multiple times a week, J.N.'s

behavioral problems were so serious that K.N. would be called

and asked to pick him up early from the ASP.[3]  J.N.'s behavior

also deteriorated during the school day.  (Tr. 1/19/2016 at

19:14-20:1.)

Williams did not observe J.N.'s behavior at the ASP during

this time period, but was able to observe J.N.'s behavior during

the school day when she visited his classroom.  It appears that

J.N.'s behaviors were stable when he began the ASP during fall

2013.  Plaintiffs assert his behavior – during the school day –

deteriorated after leaving the ASP but before starting again in

January.  But that is not borne out by the record.  According to

Williams, there was an uptick in behavioral issues midway

---

[2] For full context, the Court notes the District did have a
behavioral plan in place for J.N. developed by Dr. Kathleen
McCabe-Odri, Ed.D., BCBA-D.  Although it may be obvious, the
Court notes that the behaviors exhibited by J.N. are a result of
his autism.  To help prevent J.N.'s aggressions, self-injurious
behaviors, and perseverations, the District utilized a "token
economy system."  For good behavior and finishing tasks, J.N.
would receive a token that could be redeemed for an activity or
item he enjoyed.  (Tr. 9/11/2015 at 55:10-21.)  The District
also used a calm area, visual schedule, and a calm card.  The
calm card was a card that listed steps for calming J.N., which
consisted of counting to five and then saying "I am calm."  (Tr.
9/11/2015 at 53:21-54:1.)  The visual schedule showed J.N.'s
schedule for the day in pictures on his iPad so he would know
exactly what he would be doing at all times of the day.  (Tr.
9/11/2015 at 54:7-17.)

[3] Plaintiffs attribute the behavioral issues to Heitman's lack of
training, not J.N.'s inability to attend the ASP without serious
behavioral issues.  This will be discussed more infra.

through and at the end of the second marking period which coincided with J.N.'s January return to the ASP – with the additional staffing discussed, _infra_. (Tr. 1/19/2016 at 76:17-77:3, 78:17-20, 100:10-101:13.)

On October 2, 2013, K.N. again reached out to Williams, via email, and stated she thought Heitman needed both training and support from a special education teacher. (Pls.' Mot. for J., Ex. 8.) Specifically, K.N. noted J.N. was successful the previous spring when J.N. had a trained and supported one-to-one aide. (Pls.' Mot. for J., Ex. 8.) Heitman resigned in October 2013, according to the parties, because she felt she could not properly maintain J.N.'s behavior. (Def.'s SOMF ¶ 29.) As a result, J.N. was unable to attend the ASP starting in October 2013 until a new replacement could be found.

### *Spring 2014*

After Heitman resigned, the District and Plaintiffs discussed an alternative arrangement to allow J.N. to continue attending the ASP. K.N. requested trained, one-to-one support for J.N. in the ASP. The District agreed to provide J.N. with a special education teacher and two aides, with one aide to be removed after six weeks. According to the District, this arrangement was made to ensure the safety of staff and students.[4]

---

[4] Plaintiffs deny this without citation to the record. Plaintiffs merely argue this was required to ensure legal access

The special education teacher was Maria Maiorano and the aides were Williams, the previously mentioned school social worker, and Karina Pennoc.  Williams began in January and was faded out by the middle of February.

During Williams's time with J.N., he still exhibited aggressive behaviors, self-injurious behaviors, and perseverations[5] at the ASP.  His aggressive behaviors were limited to pinching; Williams does not recall any successful bites.  According to Williams, during this time period, J.N. was sometimes picked up after homework and silent reading time, before social interactions began between the students.  As a result of this, and the amount of aides and teachers that supervised J.N., J.N. did not receive much social interaction with other students.  Williams also testified that it was difficult to get J.N. onto and off the bus.  (Tr. 9/11/2015 at 82:5-83:11.)  Williams did, however, note that J.N.'s behavior issues, which increased in the fall of 2013, leveled off into late-winter 2013 and spring 2014.  (Tr. 1/19/2016 at 31:23-32:1,

---

to the ASP.  Thus, this is not a genuine disputed fact, just a disagreement of law more properly decided infra.

[5] J.N.'s perseverations usually centered around a few topics.  If he was not feeling well, J.N. would repeat "ears" and "doctors." (Tr. 9/11/2015 at 51:18-24.)  If he thought it was the end of the day, wanted to go home, or if his one-to-one aide, Haggerty, left the room, J.N. would say words like "Mommy," "McDonald's," "bus," "home," and "Ms. Haggerty."  (Tr. 9/11/2015 at 51:18-24, 52:9-17.)

81:23-82:17.)  Williams, when questioned about the J.N.'s

behaviors stated that she "still saw behaviors in [the ASP], but

due to the amount of staff members we were able to – to <u>maintain</u>

him." (Tr. 1/19/2016 at 29:16-24 (emphasis added).)

***Fall 2014***

At the beginning of the 2014-2015 school year, J.N.'s one-

to-one aide in the ASP was Susan Marinelli.[6]  As stated <u>supra</u>,

J.N. was not bussed, but instead transferred classrooms within

Mary Ethel.  Williams and Brennan created a timeline around the

time J.N. was in the ASP and noted increased anxiety and

behavior issues in both the ASP and during the school day in

October 2014. (Tr. 1/19/2016 at 40:12-23.)  As of October 28,

2014, when Marinelli resigned, J.N. did not attend the ASP.

According to Williams, Marinelli "resigned from the [ASP] due to

multiple injuries sustained from J.[N.]" (Tr. 1/19/2016 at

40:24-41:1.)  In November 2014, J.N.'s behavior issues

culminated in two successful bites on two separate staff

members, Orsino and Rose Fitzpatrick, a speech therapist for the

District. (Tr. 1/19/2016 at 41:8-13.)  Brennan stated that when

J.N. attended the ASP with Marinelli in fall 2014, his time in

the ASP "was not successful." (Tr. 1/19/2016 at 187:24-188:2.)

---

[6] Marinelli was also a paraprofessional in J.N.'s classroom
during the 2013-2014 and 2014-2015 school year.  J.N.'s teacher,
Brennan, testified that Marinelli was "intimately familiar" with
J.N.'s IEP, which included his behavior plan. (Tr. 1/19/2016 at
130:16-19.)

8

Lauren Bermudez, a paraprofessional who also worked in the ASP during fall 2014 (not with J.N.), stated that Marinelli told her that "J.N. was overwhelming her and was too much for her." (Pl.'s Mot. for J., Ex. 9 14.)

The District and Plaintiffs ultimately did not agree on whether to allow J.N. to continue to attend the ASP. The District stated that it would not allow J.N. back into the ASP until the behavior issues he was exhibiting at the time were stabilized. Plaintiffs insisted that J.N. could attend as long as he was given the support he received in spring 2014. The District refused, only offering a one-to-one aide without the support of a special education teacher. As stated supra, the ASP was discontinued at the end of the 2014-2015 school year for lack of funding. It appears that during this entire time period, even though J.N. was experiencing behavioral issues both in the classroom and in the ASP, J.N. continued to progress towards his goals during the school day.

Thereafter, Plaintiffs filed a Petition for Due Process ("Petition") with the New Jersey Office of Special Education Programs on January 22, 2015. The Petition listed four counts: (1) violation of Individuals with Disabilities Education Act ("IDEA") for refusal to add the ASP to J.N.'s IEP; (2) violation of IDEA for pre-determining that the J.N.'s IEP would not include the ASP; (3) Americans with Disabilities Act ("ADA") and

9

Section 504 of the Rehabilitation Act ("Section 504") violations for limiting or denying J.N. participation in the ASP; and (4) interference claim under the ADA for denying J.N. benefits, here the ASP, to which he was entitled. Plaintiffs requested declaratory, compensatory, and injunctive relief as well as attorney's fees.

An administrative hearing was held on September 11, 2015, January 19, 2016, and April 18, 2016 before ALJ Susan M. Scarola. Witnesses who provided services to J.N. during the time periods at-issue were examined by the parties. On September 8, 2017, the ALJ issued a written opinion. In it, the ALJ made specific findings of fact and conclusions of law – which will be discussed as relevant <u>infra</u>. The conclusions of law can be split into two separate categories. On the issue of whether a free and appropriate public education ("FAPE") was provided to J.N., the ALJ concluded it had been. On the issue of whether there were ADA or Section 504 violations, the ALJ concluded that J.N. had been provided access to the ASP with proper supports in place.[7]

Plaintiff filed a complaint in this Court on October 6, 2017. Essentially, the complaint requests this Court to review the decision of the ALJ on only a subset of the issues presented

---

[7] The Court finds it important to note that the ALJ's opinion did not mention Section 504, the ADA, or NJLAD except to note Plaintiffs had brought claims under these statutes.

to the ALJ.  Plaintiffs do not appeal the decision insofar as it decided the dispute under IDEA and held that J.N. had received FAPE.  Instead, the sole focus of Plaintiffs' appeal concerns anti-discrimination laws – specifically Section 504, Title II of the ADA, and the corresponding New Jersey Law Against Discrimination ("NJLAD") provisions.

Plaintiffs filed a Motion for Judgment on July 27, 2018. It has been fully briefed by the parties and is ripe for adjudication.

## ANALYSIS

### A.    Subject Matter Jurisdiction

This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1367.

### B.    Motion for Judgment on the Administrative Record Standard

Although technically framed before the Court as a motion for summary judgment, this is an appeal of the ALJ's ruling in the underlying administrative proceedings.  This case presents a somewhat peculiar issue concerning the standard of review. Plaintiffs explain that because IDEA violations were initially asserted, administrative exhaustion was required for both the IDEA and non-IDEA claims under 20 U.S.C. § 1415(l).  (Pls.' Mot. for J. 1.)  So, although the claims now before the Court would not typically be the subject of an appeal – as they are not

necessarily subject to an administrative exhaustion requirement
when brought standing alone – they are presently before the
Court in that procedural posture.

Normally, in an IDEA case, the Court would apply a modified
de novo standard of review to the factual findings made by an
ALJ. E.I.H. v. Fair Lawn Bd. of Educ., 747 F. App'x 68, 71 (3d
Cir. 2018). Under that standard, a district court would be
required to give "due weight" to the factual findings of an ALJ,
and, if the district court departs from the ALJ's factual
findings, it must explain its reasons for doing so. Id. (citing
S.H. v. State-Operated Sch. Dist. of City of Newark, 336 F.3d
260, 270 (3d Cir. 2003)). Although the "due weight" standard is
not explicitly stated in the IDEA statutory scheme, it does
arise out of the Supreme Court's interpretation of it. See
Carlisle Area Sch. v. Scott P. by & through Bess P., 62 F.3d
520, 527 (3d Cir. 1995), cert. denied, 517 U.S. 1135 (1996)
(citing Bd. of Educ. v. Rowley, 458 U.S. 176, 206 (1982)).
Thus, it does not necessarily apply to claims under Section 504
or the ADA.

This is where the issue arises in the instant case.
Plaintiffs have only appealed the Section 504 and ADA claims
that were heard before the ALJ. The Third Circuit has yet to
determine whether, in this particular factual scenario, the
modified de novo or de novo standard of review applies. T.F. v.

<u>Fox Chapel Area Sch. Dist.</u>, 589 F. App'x 594, 598 (3d Cir. 2014).  Thus, this Court will apply a de novo standard of review to the facts.  This seems appropriate in this case because the claims at issue here were only brought before the ALJ because of the requirement to exhaust the IDEA claims.  Moreover, the modified de novo standard stems from an interpretation of IDEA, not from any interpretation of Section 504 or the ADA.

Under any set of facts, legal determinations must be reviewed de novo.  <u>A.D.L. v. Cinnaminson Twp. Bd. of Educ.</u>, 975 F. Supp. 2d 459, 464 (D.N.J. 2013); <u>W. Windsor-Plainsboro Reg'l Sch. Dist., Bd. Of Educ. v. M.F. & M.F.</u>, No. Civ. A. 09-4326, 2011 U.S. Dist. LEXIS 21827, at *22 (D.N.J. March 4, 2011) (citing <u>Carlisle Area Sch.</u>, 62 F.3d at 528).  Accordingly, the Court will review both legal and factual determinations made by the ALJ de novo.

**C.    Motion for Judgment on the Administrative Record**

Plaintiffs set forth several factual findings and legal conclusions from the ALJ's opinion that they assert are erroneous.  The Court will examine the factual findings first. Once the factual issues have been decided, the Court will examine the legal conclusions challenged by Plaintiffs.  These issues will be decided under the de novo standard explained <u>supra</u>.  Before it does so, the Court will first determine whether the laws at issue are applicable to this case.

a. Whether Federal and State Anti-Discrimination Law
   Applies to the ASP

First, this Court considers a threshold matter: whether

Section 504, the ADA, or the NJLAD apply to the ASP. Plaintiffs

assert it does and it appears the District does not dispute that

assertion. For the sake of completeness – and to better put in

context the errors cited by Plaintiffs in the ALJ's opinion -

this Court will consider whether each of the laws cited supra

apply. The Court will address each in turn.

Section 504 states:

No otherwise qualified individual with a disability in
the United States, as defined in section 705(20) of
this title, shall, solely by reason of her or
his disability, be excluded from the participation in, be
denied the benefits of, or be subjected to
discrimination under any program or activity receiving
Federal financial assistance . . . .

29 U.S.C. § 794. By its plain text, Section 504 applies to a

federally-funded ASP provided by a New Jersey public school.

Title II of the ADA states that:

no qualified individual with a disability shall, by
reason of such disability, be excluded from
participation in or be denied the benefits of the
services, programs, or activities of a public entity,
or be subjected to discrimination by any such entity.

42 U.S.C. § 12132. By its plain text, it is clear that the ADA

applies to a federally-funded ASP provided by a New Jersey

public school.

NJLAD states:

> All persons within the jurisdiction of this state
> shall be entitled to the full and equal
> accommodations, advantages, facilities and privileges
> of any places of public accommodation, resort or
> amusement, subject only to the conditions and
> limitations established by law and applicable alike to
> all persons.

N.J. STAT. ANN. § 10:1-2. Again, by its plain text, NJLAD would clearly apply to an ASP provided by a New Jersey public school.

All parties agree, the standard under all three of these statutes[8] requires J.N. to show he: "(1) has a disability; (2) was otherwise qualified to participate in a school program; and (3) was denied the benefits of the program or was otherwise subject to discrimination because of [his] disability." Chambers v. Sch. Dist. of Phila. Bd. of Educ., 587 F.3d 176, 189 (3d Cir. 2009) (citing Nathanson v. Med. Coll. of Pa., 926 F.2d 1368, 1380 (3d Cir. 1991)).[9] It appears the parties do not dispute whether J.N. had a disability and whether he was

---

[8] The Court notes that both Section 504 and NJLAD are, for the most part, interpreted consistently with the ADA. See Chisolm v. McManimon, 275 F.3d 315, 324 n.9 (3d Cir. 2001) ("[W]e will confine our discussion to the ADA with the understanding that the principles will apply equally to the Rehabilitation Act and NJLAD claims."). As is likely obvious, the ADA is also interpreted consistently with Section 504. Berardelli v. Allied Servs. Inst. of Rehab. Med., 900 F.3d 104, 114-18 (3d Cir. 2018).

[9] The Court notes for the record that Section 504 claims also require that the school district receive federal funding. Blunt v. Lower Merion Sch. Dist., 767 F.3d 247, 274 (3d Cir. 2014). Since the District received federal funding specifically for this program, the Court finds this element is met here.

otherwise qualified.[10]  Thus, the dispute between the parties

solely concerns the third element.

In terms of access, the "substantive standards" under

Section 504 and the ADA "are the same." Blunt, 767 F.3d at 275

(quoting Ridley Sch. Dist. v. M.R., 680 F.3d 260, 282-83 (3d

Cir. 2012)).  On that point, the Third Circuit has explained:

> a school district must reasonably accommodate the
> needs of the handicapped child so as to ensure
> meaningful participation in educational activities and
> meaningful access to educational benefits. . . .
> However, § 504 does not mandate "substantial" changes
> to the school's programs, and courts "should be
> mindful of the need to strike a balance between the
> rights of the student and [his or her] parents and the
> legitimate financial and administrative concerns of
> the [s]chool [d]istrict."

Blunt, 767 F.3d at 274 (quoting Ridley, 680 F.3d at 280-81)

(alterations in original).  The Court will discuss specific

rules as applicable, infra.

b. Whether the ALJ Committed Error by Ignoring the Fact
   That J.N. Successfully Attended the ASP with a Special
   Education Teacher and an Aide

Here, Plaintiffs argue that the ALJ ignored the fact that

J.N. successfully attended the ASP when provided with a special

education teacher and at least one one-to-one aide in spring

2014.  Then, Plaintiffs cite portions of the ALJ's decision

which state exactly this point.  The ALJ, at multiple points

---

[10] There is no question that J.N.'s autism qualifies as a
disability under any of these three statutes.  See, e.g., 34
C.F.R. § 104.3(j), (l)(2), & (m) (regulations defining
"handicapped person" under Section 504).

16

within the opinion, stated J.N. had access to the program during spring 2014 when provided with a special education teacher and two one-to-one aides (and, later, only one one-to-one aide). Thus, the Court finds Plaintiffs' argument is built on a fallacy: the ALJ did not ignore what she herself stated.[11]

To the extent Plaintiffs argue that either (1) J.N.'s behavior in fall 2014 was a result of an untrained one-to-one aide or (2) legal access to the ASP for J.N. may only be achieved if J.N. is provided with a special education teacher who supervises a trained one-to-one aide, this Court will address those arguments infra.[12]

c. Whether the ALJ's Finding of Fact Concerning Bussing was Clearly Erroneous

---

[11] Moreover, Plaintiffs later argue "[t]he ALJ acknowledged that J.N. successfully attended the after[-]school program with [a one-to-one aide trained and supported by a special education teacher] in the spring of 2014." (Pl.'s Mot. for J. 12 (emphasis added).) This directly contradicts Plaintiffs' argument here.

[12] If, instead, Plaintiffs argue that legal access is only achieved when a child is successful, the Court rejects that assertion. This is not because the Court does not wish J.N. (or any child for that matter) success, but because it is not the legal standard. The standard here is meaningful access, not success. See Alexander v. Choate, 469 U.S. 287, (1985) ("Section 504 seeks to assure evenhanded treatment and the opportunity for handicapped individuals to participate in and benefit from programs receiving federal assistance. Se. Cmty. Coll. V. Davis, 442 U.S. 397 (1979). The Act does not, however, guarantee the handicapped equal results . . . ." (emphasis added)).

The ALJ found that the increase in behaviors starting in fall 2014 "came from several factors" including transferring schools and dislike of the bus.  Plaintiffs argue that this factual finding was incorrect, as the hearing testimony of Williams shows he was not bussed during the 2014-2015 school year because the ASP was provided at Mary Ethel – the school J.N. attended at the time.  Defendants do not dispute that this finding was incorrect, but argue this was only one of the factors cited and is a minor point of contention.

The Court finds, viewing the factual findings de novo, that during fall 2014, J.N.'s behavioral problems could not have stemmed from transferring schools or bussing.  The Court will determine the import of this error in context when examining the other factual findings and conclusions of law challenged by Plaintiffs.

      d. <u>Whether the District was Required to Present Data Concerning the Source of J.N.'s Behavior</u>

The ALJ found that the increase in behaviors starting in fall 2014 "came from several factors: a long school day; a resistance to transferring from one school to another; dislike of the bus; and health problems."  (Pl.'s Mot. for J., Ex. 9 20.)  On those findings, Plaintiffs assert that because the District did not provide data concerning J.N.'s behavior during the time he attended the ASP, the ALJ's factual findings were

18

based on speculation.  The District does not dispute that no data was collected for the relevant time periods, but points out that it had no statutory obligation to collect data.  Obviously, whether the District had an obligation to collect data does not address whether the evidence presented was sufficient to show that J.N.'s behavior was caused by his attendance at the ASP.

It appears then, that all parties agree: no behavioral data was collected during the time periods at issue – specifically when J.N. was attending the ASP.  But, it does not automatically follow that the ALJ's findings of fact on the source of J.N.'s behavior is solely speculation.  In fact, Plaintiffs' argument hinges solely on the testimony of Williams.  Here is the testimony cited by Plaintiffs:

> Q:   Okay and the purpose of data collection is so
> that you can determine the function of the behavior,
> correct?
> A:   Correct.
> Q:   And there was never any data collection of the
> type that's exhibited in R-38 while J. was attending
> the [ASP], was there?
> A:   No.

(Tr. 1/19/2016 at 96:25-97:7.)

Plaintiffs interpret this testimony as an admission that the root cause of a behavior (in behavioral terms, the "function") may only be determined through data collection. While the Court agrees with Plaintiffs to the extent they assert the function of a behavior may be determined through data

collection, the testimony does not go so far as to state there is no other means of doing so.  While the Court acknowledges the methodology (to the extent it could be called one) is not rigorous or particularly sophisticated, it does not mean that the ALJ based her opinion on speculation.  In fact, there is ample record evidence to support the ALJ's findings here. Multiple witnesses, including those with the most constant day-to-day contact with J.N. noticed marked changes in the amount of behaviors when he was in the ASP as opposed to when he was not and attributed the increase in behaviors to the factors the ALJ cited.  While the weight of this testimony may be relatively low, since Plaintiffs did not present contrary evidence, this testimony stands as stated.

Moreover, Plaintiffs provide the Court with no legal requirement that this type of evidence must be reduced to the form of data to be admissible or reliable.  This Court reviewing the factual findings of the ALJ de novo, finds that it was not incorrect for the ALJ to rely on testimony of various witnesses for the proposition that J.N.'s misbehavior stemmed from attendance at the ASP.[13]

> e. <u>Whether the Source of J.N.'s Behavior Was a Lack of Proper Support or the Reasons Cited by the ALJ</u>

---

[13] To the extent Plaintiffs' challenge is legal in nature, the Court additionally finds the ALJ did not rely upon speculation or inadmissible evidence in coming to her conclusion.

The larger argument presented by Plaintiffs on the facts is whether J.N.'s behavior is more properly attributed to a lack of proper support – here a trained one-to-one aide supported by a special education teacher – or whether it stemmed from J.N.'s anxiety over attending the ASP, the long day, and various ailments, among other factors cited by the ALJ. To determine the answer to this question, the Court will set up the evidence supporting each side and then determine, de novo, whether the ALJ correctly attributed J.N.'s behavior to the factors listed supra.

Plaintiffs cite the following evidence in support of the fact that J.N.'s behavior issues stemmed from lack of support:

- J.N. successfully attended the ASP in spring 2013 with a trained one-to-one aide supported by a special education teacher;

- J.N. successfully attended the ASP in spring 2014 with one or two trained one-to-one aides supported by a special education teacher;

- In spring 2014, Brennan, J.N.'s teacher, noted J.N. "was able to sit for longer periods of time with limited behavior problems";

- Sometime in spring 2014, Brennan also noted a "huge decrease in aggressive behaviors," (Pls.' Mot. for J., Ex. 4); and

- J.N. has attended a different ASP from July to December
  2015 – with one-to-one support and access to a group aide –
  and January 2016 to present – with two-to-one support.

(Pls.' Mot. for J. 13-14.)  It appears Plaintiffs request the
Court to infer based on the amount of supervision that J.N. had
at any given time directly impacted J.N.'s behavior.

Defendant cites or the record shows the following evidence
in support of the fact that J.N.'s behavior stemmed from other
factors:

- Williams noticed an increase in J.N.'s behaviors when J.N.
  attended the ASP, and specifically thought it was because
  of a long school day and chronic ear infections, (Tr.
  1/19/2016 at 27:22-28:19);

- Williams, who observed J.N. at the ASP and in the classroom
  from January to mid-February 2014, stated J.N. was still
  exhibiting aggressive behavior to other students and staff
  members, (Tr. 1/19/2016 at 29:16-30:16);

- Williams, as a result of completing a behavioral analysis,
  believed that behavioral spikes seen when Haggerty left the
  room were related to J.N.'s anxiety with going to the ASP
  because he associated Haggerty leaving with the end of the
  school day, (Tr. 1/19/2016 at 51:9-22);

- Williams believed, generally, that "the after[-]school program was kind of detrimental to J.N. because we would see his anxiety increase whenever he would have to attend the after school program" and then listed examples of behavioral issues she witnessed related to this anxiety, (Tr. 9/11/2015 at 80:21-83:11);

- Brennan, J.N.'s special education teacher, noticed an increase in behavioral issues during the school day that correlated with the time period during which J.N. attended the ASP and a decrease after he stopped attending, (Tr. 1/19/2016 at 157:7-159:15, 160:10-21, 167:15-24);

- Brennan noted a decrease in J.N.'s aggressive behaviors after he started on new medicine in approximately January 2014, (Tr. 1/19/2016 at 178:7-21).

Reviewing these facts de novo, the Court finds that the factors cited by the ALJ correctly describe what the testimony and evidence showed. Various factors contributed to J.N.'s behaviors at the ASP and at school. The simple fact is that there was no testimony on the record which attributed an increase in behaviors to the individuals or amount of individuals supervising J.N. The only evidence on the record attributed J.N.'s behavioral issues to the factors described by the ALJ, as well as J.N.'s anxiety over attending the ASP. The

Court cannot ignore that evidence and come to a conclusion which contradicts it.

The Court notes, however, this factual disagreement misses the bigger picture. J.N. is a child with autism. Whatever the function of his behaviors may be, it is clear the behaviors resulted from his autism. The behavioral issues cited – aggression, perseverations, self-injurious behavior, and tantrums – are all commonly exhibited by children with autism and stem from biological and structural differences in the brain. A.L. v. Walt Disney Parks & Resorts US, Inc., 900 F.3d 1270, 1280-81 (11th Cir. 2018). In fact, the ALJ specifically found that "J.N. exhibits problem behaviors which are a symptom of his condition." (Pls.' Mot. for J., Ex. 9 17.)

On the whole, the record supports the fact that those who worked with J.N. on a daily basis attributed his behavioral issues in the program and at school to a variety of factors, not the least of which was J.N.'s anxiety of attending the program. No witness believed it was because of the aides used in the ASP. With the record lacking in support of Plaintiffs' requested inference, the Court cannot find that Plaintiffs are correct. Thus, viewing the facts de novo, the Court finds no error in the ALJ's factual finding on this point.

      f. Whether the ALJ Erred when She Concluded that the Provision of FAPE Under IDEA Meant the District Had Complied with the ADA, Section 504, and NJLAD

Plaintiffs next argue there are legal errors in the ALJ's opinion. One is that the ALJ incorrectly found that the provision of FAPE required her to rule that the District had met its obligations under the ADA, Section 504, and NJLAD. The Court cannot find that the ALJ reached that conclusion. The ALJ specifically stated in her opinion: "[a]s to access to the ASP, I CONCLUDE that the District did provide access to J.N. with supports in place." (Pls.' Mot. for J., Ex. 9 20 (emphasis added).) The use of the word access in the ALJ's opinion suggests her decision was based on the proper standard of "meaningful access."[14] Whether that decision is a different matter will be addressed infra.

g. Whether J.N. is Entitled to Access the ASP

Before determining whether J.N. was provided meaningful access, it is important to determine whether J.N. had a legal right to access the ASP. It appears clear he does under Section 504. As 34 C.F.R. § 104.37, a Section 504 regulation, makes clear:

> A recipient to which this subpart applies shall provide non-academic and extracurricular services and activities in such manner as is necessary to afford

---

[14] The Court notes Plaintiffs' argument cites statutes, regulations, and case law. The Court does not ignore these standards and will consider those arguments when determining the ultimate question presented by Plaintiffs. The Court does note, however, the curious absence of any discussion of the standards under Section 504, the ADA, and NJLAD in the ALJ's opinion.

handicapped students an equal opportunity for participation in such services and activities.

The answer is equally clear under the ADA. An ADA regulation, 34 C.F.R. § 300.107(a) requires:

Each public agency must take steps, including the provision of supplementary aids and services determined appropriate and necessary by the child's IEP Team, to provide nonacademic and extracurricular services and activities in the manner necessary to afford children with disabilities an equal opportunity for participation in those services and activities.

As Plaintiffs point out, and the District does not dispute, even if an activity may not be required for FAPE by IDEA, Section 504, the ADA, and NJLAD may still require a school to provide supports to allow equal access. The Court finds here that the ASP is properly governed by these statutes and that the District was required to provide J.N. with meaningful access.

h. Whether J.N. was Provided Meaningful Access to the ASP

With the relevant overarching law and facts in place, the Court can finally approach the most important legal question presented by Plaintiffs' appeal: whether the District provided J.N. with meaningful access to the ASP. The District rebuts Plaintiffs' argument that there was no meaningful access, by relying on the fact that J.N.'s behaviors were not the result of his supervision but based on the factors cited by the ALJ. Defendant also cites case law that an accommodation is not reasonable or necessary if it does not provide more appreciable access.

As described supra, claims under Section 504, the ADA, and NJLAD require Plaintiffs to prove that J.N.: "(1) has a disability; (2) was otherwise qualified to participate in a school program; and (3) was denied the benefits of the program or was otherwise subject to discrimination because of [his] disability."  Chambers v. Sch. Dist. of Phila. Bd. of Educ., 587 F.3d 176, 189 (3d Cir. 2009) (citing Nathanson v. Med. Coll. of Pa., 926 F.2d 1368, 1380 (3d Cir. 1991)).  Only the third element here is contested.

The third element may be shown when a plaintiff proves he was not given meaningful access to a program, here the ASP.  As described supra, "meaningful access" means "evenhanded treatment and the opportunity for handicapped individuals to participate in and benefit from programs receiving federal assistance."  Alexander v. Choate, 469 U.S. 287, 304 (1985) (citing Se. Cmty. Coll. v. Davis, 442 U.S. 397 (1979)).  One legal theory proving the above element is a failure to accommodate.  Here, Plaintiffs argue a trained one-to-one aide supervised by a special education teacher was the reasonable accommodation necessary to give J.N. meaningful access to the ASP.  Defendant argues the accommodation provided – a one-to-one aide – was all that was reasonable and necessary to give J.N. meaningful access.  Therefore, in Plaintiffs' view, the District has failed to accommodate J.N.

The Third Circuit recently stated that:

> claims alleging failure to accommodate under [Section 504] involve the same tripartite inquiry as those under the ADA: (1) whether the requested accommodation is reasonable; (2) whether it is necessary; and (3) whether it would fundamentally alter the nature of the program.

Berardelli v. Allied Servs. Inst. of Rehab. Med., 900 F.3d 104, 123 (3d Cir. 2018).

Generally, to determine whether an accommodation is reasonable "depends on the individual circumstances of each case, and requires a fact-specific, individualized analysis of the disabled individual's circumstances and the accommodations that might allow him to" enjoy meaningful access. Mark H. v. Hamamoto, 620 F.3d 1090, 1098 (9th Cir. 2010) (quoting Vinson v. Thomas, 288 F.3d 1145, 1154 (9th Cir. 2002)). An accommodation is not reasonable if it requires "an organization to make fundamental or substantial alterations to its programs." Id.; see also Nathanson, 926 F.2d at 1384-86.

The Third Circuit has also opined particularly on the element of necessity. "[A] plaintiff 'may not insist on a particular accommodation if another reasonable accommodation was offered,' Third Circuit Model Civil Jury Instructions § 9.1.3, [but] such an alternative, in order to defeat necessity and serve as a defense, also must provide that 'meaningful access.'" Berardelli, 900 F.3d at 125 (quoting Choate, 469 U.S. at 301).

To state it another way, "when an individual already has 'meaningful access' to a benefit to which he or she is entitled, no additional accommodation, 'reasonable' or not, need be provided by the grantee." A.M. ex rel. J.M. v. New York City Dep't of Educ., 840 F. Supp. 2d 660, 680 (E.D.N.Y. 2012), aff'd, 513 F. App'x 95 (2d Cir. 2013). "[A]ny requested accommodation must first be deemed necessary to ensure an individual with disabilities has 'meaningful access' to the benefit in question." A.M. ex rel. J.M., 840 F. Supp. 2d at 680 (citing Se. Cmty. Coll. v. Davis, 442 U.S. 397, 410 (1979)).[15]

The Court will address the elements of reasonableness and necessity. Within that analysis, because of the way the element of necessity is structured, the Court will make a determination about whether the District's accommodation provided J.N. with meaningful access. It will not, however, address the element of fundamental alteration in-depth. The District does not argue that the requested accommodation would be a fundamental or substantial alteration. Nonetheless, the Court finds it would not be because J.N. attended the ASP with the requested

---

[15] In this case, that requires the Court to determine both that the District's given accommodation did not afford meaningful access and that Plaintiffs' proposed accommodation would have meet the above test to show there was a failure to accommodate.

accommodation in spring 2014.[16]  There is no indication from the record that this worked a fundamental alteration.

First, the Court will determine whether the requested accommodation was reasonable.  To do so, the Court must determine the individual circumstances of this case.  J.N.'s individual circumstances have been explained in detail, supra. To briefly repeat, J.N. has autism.  His autism sometimes results in behavioral issues that include aggressions (like pinching or biting), perseverations, tantrums, and self-injurious behaviors.  To help alleviate these behaviors, the District created a behavioral plan that includes a token economy system, a visual schedule, and a calm card.  During the school day (at the time period in question), J.N. received the help of a dedicated one-to-one aide, Haggerty, who was under the supervision of a special education teacher, Brennan.  The ASP,

---

[16] In the context of extracurricular athletics, the Department of Education has opined:

> Because the school district always has a legal obligation under IDEA to provide aids or services in its education program to enable any IDEA-eligible students to participate in extracurricular activities, providing these aids or services after school to a student with a disability not eligible under the IDEA would rarely, if ever, be a fundamental alteration of its education program.

U.S. Dep't of Educ., Office of Civil Rights, "Dear Colleague Letter" at 8 (Jan. 25, 2013).  In other words, without argument to the contrary, there is no reason to believe this would work a fundamental alteration of the ASP, especially considering how similar the ASP is to a normal school day.

similar to the school day, involves silent time to do work, a snack break, and group activities. The ASP was inclusive, including both special and non-special education students.

Plaintiffs argue their proposed accommodation is reasonable, because the District already provided it during spring 2014. The District counters that the proposed accommodation is unduly burdensome and does not provide additional benefit to J.N. The question of whether this is an undue financial burden is a defense considered, infra. The question of whether the accommodation would provide an additional benefit is more properly disposed of after analyzing the questions of reasonableness and necessity. Regardless, it is Plaintiffs' burden to prove their proposed accommodation was reasonable.

The Court finds, based on the facts, that Plaintiffs' requested accommodation is reasonable. The two accommodations presented to the Court are (1) the provision of a one-to-one aide and (2) the provision of a one-to-one aide supported by a special education teacher. As the case law cited supra shows, the Court must consider the circumstances and accommodations together to determine which might allow him to enjoy meaningful access.

The facts of this case show the amount of access received by J.N. under both accommodations. With merely a one-to-one

aide, J.N.'s behaviors were unable to be maintained.  J.N.
either could not attend the ASP under the aide or the aide
resigned.  The record reflects that both aides, Heitman and
Marinelli, could not maintain J.N.'s behaviors and Heitman
explicitly stated she resigned because of her inability to
maintain J.N.'s behaviors.  With a one-to-one aide supported by
a special education teacher, J.N.'s behaviors were maintained.
J.N. attended the ASP, even with his behavioral issues and
sometime absences, under this arrangement.

Obviously, without the provision of Plaintiff's proposed
accommodation, J.N. is unable to receive meaningful access,
because he is not able to attend the ASP in any substantive
sense and thus did not receive an equal opportunity to
participate.  The facts clearly show a pattern: if J.N.'s autism
– which manifests in his behavioral issues – cannot be
maintained, he is unable to actually attend and participate in
the ASP.  Either he must be sent home or his aide resigns
because of a failure to maintain his behavior.  Because
Plaintiffs' proposed accommodation does allow for meaningful
access, it is reasonable.

Moreover, the Court finds the similarities between the
school day and the ASP make it reasonable for J.N. to receive
the same level of support.  Because the ASP is merely an
extension of the school day, it is reasonable J.N. to receive

Plaintiffs' proposed accommodation. Because of the fact that this type of support was provided to J.N. every school day and in spring 2014, the Court can see no administrative or financial reason why this amount of support could not or cannot be provided by the District.

In this case, the questions of reasonableness and necessity have bled together. Because only Plaintiffs' proposed accommodation provides meaningful access, it would logically follow that it is necessary. The Eighth, Ninth, and Eleventh Circuit have developed a test for determining whether an accommodation is necessary that is also persuasive[17] here. In the interest of completeness, the Court will consider it is as well. To determine whether a reasonable accommodation is necessary, a court should:

> (1) "start by considering how . . . facilities are used by nondisabled guests," and (2) "then take reasonable steps to provide disabled guests with a like experience."

A.L. v. Walt Disney Parks & Resorts US, Inc., 900 F.3d 1270, 1294 (11th Cir. 2018) (quoting Argenyi v. Creighton Univ., 703 F.3d 441, 449 (8th Cir. 2013); Baughman v. Walt Disney World Co., 685 F.3d 1131, 1135 (9th Cir. 2012)).

---

[17] The Court finds it likely that even though these cases arise under Title III of the ADA, they would be equally applicable under Title II of the ADA. Berardelli, 900 F.3d at 114-16 (explaining how Titles I-III of the ADA have been read to create similar, if not identical, standards).

Under this test of necessity, Plaintiffs' proposed accommodation would also be considered necessary.  J.N. has only been able to attend the program with his behaviors maintained when he receives a one-to-one aide supported by a special education teacher.  Of the accommodations at-issue, this is the only one which would provide him with a "like experience."  The other accommodation fails ab initio because J.N. cannot attend, much less participate and achieve a like experience.

The District argues that the Plaintiffs' proposed accommodation is not either reasonable or necessary because "J.N. exhibited behavioral problems in the program regardless of the amount of support provided."  (Def.'s Opp'n Br. 15 (emphasis in original).)  In other words, the extra help did nothing to improve J.N.'s behaviors.  The Court agrees J.N.'s behaviors persisted throughout his time in the ASP.  And the Court agrees that this resulted – at least in fall 2013, between January and mid-February 2014, and in fall 2014 – in Plaintiffs arriving early on numerous occasions to pick up J.N. from the ASP because of these behaviors.  There also appears to be no dispute that (1) Plaintiffs sometimes picked up J.N. early regardless of

behavioral issues[18] and (2) three staff members may make socialization more difficult.

From a case law perspective, the District argues Eric H. v. Methacton School District is a factually analogous case which compels the Court to find Plaintiffs' requested accommodation is either not reasonable or not necessary. 265 F. Supp. 2d 513 (E.D. Pa. 2003). In that case, the child was diagnosed with acute lymphoblastic leukemia, which (along with other conditions and a lack of vaccinations) required him to miss school for fear of serious infection. Id. at 516. To enable socialization while the child was not in school, the district agreed to provide the child with a video teleconferencing system ("VTC"), which allowed him to fully participate in his classes, educationally and socially. Id. at 516-17.

But, the provision of the VTC created rather than solved the problems of social access. According to the court, it led to "attention-seeking behavior" that was disruptive to the class. Id. at 517. The court also found the VTC led to a degradation of his "social and behavioral conduct." Id. In considering a Section 504 claim, the court stated:

> Even assuming that VTC would under some circumstances
> be sufficient to confer a benefit on Eric that is
> available to his non-disabled peers, this is not the

---

[18] This fact is, however, legally irrelevant. The Plaintiffs' actions do not bear any particular relevance to the question of access.

> case here.   The record, including the explicit
> findings of the Hearing Officer and Appeals Panel,
> reflects that Eric's use of VTC disrupted his
> classmates, teacher and even impeded his progress
> toward some of his targeted social and behavioral
> objectives.   This disruption outweighs any possible
> benefit that VTC might provide.

Id. at 522 (emphasis added).

But, both the District's case law and factual arguments miss the mark.  Eric H. is inapposite, because the child in Eric H. did not have a disability that resulted in behavioral issues. The child in that case had a physical disability that made it dangerous for him to attend school.  Unlike Eric H., J.N. has autism which resulted in the behavioral issues cited by the District.  It is fundamentally incorrect to argue an accommodation is unnecessary because of an individual's disability.

The District's factual argument is also incorrect, because the proper question is not whether the behavior continued, but whether the services given ensured it was maintained.  J.N.'s fall 2013 and fall 2014 experience in the ASP show that a single one-to-one aide could not maintain J.N.  Only with the provision of a special education teacher and a one-to-one aide (or two) was J.N. able to be maintained.  Only under this scenario did the accommodation "confer a benefit on [J.N.] that is available to his non-disabled peers."  Eric H., 265 F. Supp. 2d at 522.

36

Because Plaintiffs' requested accommodation is reasonable, necessary, and would not cause a fundamental alteration of the ASP, the additional question of whether the District has proved an undue burden defense must be determined. Unquestionably, whether an accommodation is an undue burden or hardship is for the District to prove. Reyazuddin v. Montgomery Cnty., 789 F.3d 407, 414 (4th Cir. 2015) (Section 504 case); Pollack v. Reg'l Sch. Unit 75, No. 2:13-cv-109-NT, 2017 U.S. Dist. LEXIS 64611, at *18 (D. Me. Apr. 28, 2017) (citing Reed v. LePage Bakeries, 244 F.3d 254, 259 (1st Cir. 2001)) (Title II case). But, there is no evidence in the record that elucidates the issue of whether providing the requested accommodation would be an undue burden, and for that reason, the Court finds this defense insufficient. See Starego v. N.J. State Interscholastic Ath. Ass'n, 970 F. Supp. 2d 303, 313-14 (D.N.J. 2013) (rejecting defendant's undue burden argument in Title II ADA case because defendant provided insufficient evidence).

Accordingly, the Court finds – reviewing the law de novo – that the ALJ erred in finding the District provided J.N. meaningful access to the ASP under Section 504, the ADA, and NJLAD. The Court finds it did not and that only the accommodation given in spring 2014 could have afforded J.N. meaningful access to the program. As a result, the District has violated Section 504, the ADA, and NJLAD.

i. Whether J.N. was Subjected to Unnecessary Social
   Isolation

The other legal question presented on appeal is whether
J.N. was unlawfully subjected to unnecessary social isolation by
the District when it denied him meaningful access to the ASP.
The District does not directly rebut this argument.  Instead,
the District argues because its accommodation provided
meaningful access, there was no unnecessary social isolation.
Based on the Court's conclusion of law, supra, this argument
fails.

But, it is still Plaintiffs' burden to show that J.N. was
subjected to unnecessary social isolation.  The Court finds here
that the regulations implementing Section 504 and the ADA
required the District to provide the ASP in the "most integrated
setting."  See 28 C.F.R. § 35.130(d) ("A public entity shall
administer services, programs, and activities in the most
integrated setting appropriate to the needs of qualified
individuals with disabilities." (emphasis added)); 28 C.F.R. §
41.51(d) ("Recipients shall administer programs and activities
in the most integrated setting appropriate to the needs of
qualified handicapped persons." (emphasis added)).

In practice, the Third Circuit has stated that "the ADA and
its attendant regulations clearly define unnecessary segregation
as a form of illegal discrimination against he disabled."  Helen

L. v. DiDario, 46 F.3d 325, 333 (3d Cir. 1995).  Because of the

similarities between the regulations, Section 504 imposes the

same requirements.  See Henrietta D. v. Bloomberg, 331 F.3d 261,

272 (2d Cir. 2003) ("[U]nless one of th[e] subtle distinctions

[between Title II of the ADA and Section 504] is pertinent to a

particular case, we treat claims under the two statutes

identically.").  Indeed, the Third Circuit has stated:

> The 504 coordination regulations, and the ADA "make
> clear that the unnecessary segregation of individuals
> with disabilities in the provision of public services
> is itself a form of discrimination within the meaning
> of those statutes, independent of the discrimination
> that arises when individuals with disabilities receive
> different services than those provided to individuals
> without disabilities."

Helen L., 46. F3d at 335 (citing approvingly an amicus brief

filed by the United States Attorney's Office).

Thus, because Plaintiffs' proposed accommodation would have

provided meaningful access and the District refused to grant

that accommodation, the District imposed unnecessary segregation

upon J.N.  J.N. was kept from an integrated social setting

because he was not given meaningful access to the ASP.  This

Court finds, viewing the conclusions of law de novo, that the

ALJ erred in not finding that this was also a violation of

Section 504, the ADA, and NJLAD and technically constituted a

form of discrimination.

### j. Remedies

Now that the Court has determined that the District has violated Section 504, the ADA, and the NJLAD, the Court must determine the appropriate next steps. The Court finds Plaintiffs have not provided the Court with (1) appropriate briefing on the remedies available in this type of action and (2) if compensatory education is the appropriate remedy, record evidence supporting the amount of hours J.N. has been deprived of meaningful access and the rate at which each hour should be charged. Instead, Plaintiffs just assert, without citation to the record, that J.N. was deprived of a certain amount of hours and that an appropriate rate per hour would be $80.

For that reason, the Court will order the parties to convene and determine an appropriate briefing schedule to address what remedies are appropriate under the law, whether damages are available (in whatever form), and the appropriate legal measure of damages in a case such as this. This supplemental brief is also to include whether Plaintiffs should be considered a prevailing party, and whether, if so, Plaintiffs should be allowed attorneys' fees. The parties are permitted to file supplemental declarations or affidavits or move before Magistrate Judge Williams for additional discovery if deemed necessary.

**CONCLUSION**

For the reasons stated herein, Plaintiffs' Motion for Judgment on the Administrative Record will be granted, in part, and the ALJ's decision will be reversed, in part.  Supplemental briefing not inconsistent with the directives of this Opinion will be ordered.

An appropriate Order will be entered.


Date:  March 29, 2019                    s/ Noel L. Hillman
At Camden, New Jersey              NOEL L. HILLMAN, U.S.D.J.